*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0100p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

LAURA BECK-WILSON et al.,

                *Plaintiffs-Appellants,*

    *v.*

ANTHONY PRINCIPI, Secretary of Veterans Affairs,
                *Defendant-Appellee.*

No. 04-4010

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 01-02265—Solomon Oliver, Jr., District Judge.

Argued: September 21, 2005

Decided and Filed: March 17, 2006

Before: DAUGHTREY, MOORE, and McKEAGUE, Circuit Judges.

---

**COUNSEL**

**ARGUED:** John F. Burke III, MANSOUR, GAVIN, GERLACK & MANOS CO., LPA, Cleveland, Ohio, for Appellants. Lynne H. Buck, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** John F. Burke III, MANSOUR, GAVIN, GERLACK & MANOS CO., LPA, Cleveland, Ohio, for Appellants. Lynne H. Buck, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge. The plaintiffs are seventeen current and former nurse practitioners ("NPs") employed by the Department of Veterans Affairs ("VA") at the Cleveland Veterans Affairs Medical Center ("VAMC") in Brecksville, Ohio. The plaintiffs brought suit against the VA under the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d) *et seq.*, alleging that, as predominantly female NPs, they are paid at a lower rate than the predominantly male physician assistants ("PAs") for performing jobs of equal skill, effort, and responsibility under similar working conditions. Plaintiff Laura Beck-Wilson also brought a wage-discrimination claim under Title VII, 42 U.S.C. § 2000e *et seq.* Although the district court held that plaintiffs had established a prima facie case of wage discrimination under the EPA, it granted summary judgment to the VA because it concluded that the VA had established its affirmative defense that "a factor other than sex," the separate statutory-based pay scales, was responsible for any sexually discriminatory difference in pay. We agree with the district court's conclusion that plaintiffs established a prima facie case under

1

the EPA, but because we conclude that plaintiffs have raised a genuine issue of material fact regarding the reason for the pay differential between predominantly female NPs and predominantly male PAs, we **REVERSE** the district court's grant of summary judgment to the defendant and **REMAND** for further proceedings consistent with this opinion.

## I.  FACTS AND PROCEDURAL HISTORY

The Cleveland VAMC consists of two hospitals and thirteen clinics in northeast Ohio, and its facilities treat almost 82,000 veterans per year. Within the VAMC medical system, nurse practitioners and physician assistants are medical practitioners who provide care to veterans. Within the Cleveland VAMC, nurse practitioners are over 95% female, and physician assistants are over 85% male. NPs are registered nurses ("RNs") with advanced training and are required to have a master's degree. The VA's functional statement for an NP requires that a candidate be certified as a nurse practitioner by the American Nursing Association and be licensed by the state as a registered nurse. An outgrowth of the historically female-dominated profession of nursing, NPs have traditionally been female. PAs, in contrast, are not required to have a bachelor's or master's degree. PAs must have graduated from an approved allied health program, where they are trained in patient assessments, histories and physicals, treatments, and technical skills. The VA's functional statement for a PA requires a minimum of two years of working experience either as a PA or in a similar primary healthcare provider position. If hired after 1993, a PA must be certified by the National Commission of Certification of Physician Assistants. As a profession, PAs find their roots within the military, where they were historically trained in a technical field to assist physicians. Traditionally PAs have been male.

NPs and PAs working at the VAMC (and other VA hospitals) are compensated according to Congressionally-determined pay scales, codified in two different statutory frameworks. NPs and other nurses are paid on a nursing pay scale, as outlined by the Nurse Pay Act of 1990, 38 U.S.C. § 7451. The Nurse Pay Act creates a nurse locality pay system, which ensures that the VA is not a pay leader in a given local market, but that its nurses are paid competitively. 38 U.S.C. § 7451(d)(3)(E). The system contains five grade levels (Nurse I - Nurse V) and a range of basic pay for each. In order to maintain competitive pay for VA nurses, the Nurse Pay Act authorizes facility directors to adjust rates of pay for covered positions to amounts comparable to the corresponding non-VA positions in the local labor market, so long as adjustments do not exceed the highest beginning rates for corresponding non-VA positions. A nurse's starting salary is determined by the Nursing Professional Standards Board ("NPSB"), and a nurse or supervisor can later request that the NPSB adjust an individual's placement on the pay scale to reflect a promotion or higher educational degree. Most NPs at the Cleveland VAMC are categorized as Nurse III on the locality pay system, which as of 2002 meant a top pay rate of $75,871 annually. Some NPs are categorized at the lower Nurse II rate, which in 2002 had a top pay rate of $64,600 annually.

PAs are paid according to the General Schedule ("GS") pay scale established in 38 U.S.C. § 7404. Each PA is classified as Associate, Full, Intermediate, Senior, or Chief pay grades, depending upon that individual's education, experience, and assignment complexity. A PA's starting pay is determined by the Medical Professional Standards Board ("MPSB") based upon experience, qualifications, and credentials. The MPSB also considers subsequent special adjustments based upon a PA's experience and advancement. Assuming their performance is satisfactory, both NPs and PAs receive regular step increases within their pay grade and cost of living adjustments as authorized by Congress.

Congress has enacted several statutory provisions that afford VA officials the discretion to increase the rate of pay for VA health care professionals when necessary. Under Title 38, the

Secretary of Veterans Affairs may increase the basic pay of VA health-care personnel[1] where necessary to provide competitive pay, achieve adequate staffing, and to recruit personnel with specialized skills, particularly those who hold skills that are especially difficult or demanding. 38 U.S.C. § 7455(b). The Nurse Pay Act also includes a provision that authorizes the VA to increase the rate of pay for nurses as needed. While normally the maximum rate of basic pay for a grade is 133 percent of the minimum rate of basic pay for that grade, 38 U.S.C. § 7451(c)(1) states that "if the Secretary determines that a higher maximum [pay] rate is necessary with respect to any . . . grade in order to recruit and retain a sufficient number of high-quality health-care personnel, the Secretary may" increase the pay up to a maximum ratio of 175 percent.

In 1990, the Cleveland VAMC adopted a special pay scale for PAs because it was having problems recruiting local candidates for entry-level PA positions. PAs working at the VAMC have continued to receive pay at this special scale since 1990, despite the fact that there has not been a recruitment or retention problem for PAs in recent memory. William Montague, the current director of the Cleveland VAMC, testified that the VAMC has not experienced any difficulty recruiting or retaining PAs since his tenure began in 1997. Nevertheless, Montague has continued to certify to the VA that it remains necessary to pay PAs on an increased pay scale in order to ensure adequate staffing and competitive pay.

In 1999, plaintiff Laura Beck-Wilson learned that her colleague Greg McDonald, a PA, was earning more money for performing the same duties than she did in her role as an NP. Beck-Wilson and McDonald worked side-by-side, and like other NPs and PAs at the VAMC, often covered for one another while on the job. Beck-Wilson found this pay differential particularly disturbing because she and another NP had actually trained McDonald to do his job at the VAMC. Beck-Wilson sought redress within her chain of command; she went before her superiors asking that as an NP she be paid at a rate equivalent to a PA, and cited evidence that other VA facilities had special pay scales for NPs that accomplished wage parity between the two positions. When she brought her complaint to Director Montague, he stated that "he was not here to cure the social ills of society," Joint Appendix ("J.A.") at 189 (Beck-Wilson Dep. at 206); J.A. 427 (Montague Dep. at 39) (recalling conversation and stating he does not deny using similar phrase), but that Beck-Wilson was a nurse, and that was why the pay difference existed. In August 1999, Beck-Wilson filed an administrative complaint with the EEOC, arguing that the pay differential between PAs and NPs violated the EPA. An evidentiary hearing was held in 2000, and in June 2001, an administrative law judge rejected Beck-Wilson's claim, stating that she had not established a prima facie case under the EPA.

In September 2001, Beck-Wilson and eighteen other NPs filed this suit alleging violations of the EPA and Title VII. Plaintiffs allege that they are predominantly female whereas PAs are predominantly male, that as NPs they perform jobs of equal skill, effort, and responsibility as PAs, that as NPs they are higher educated and have received more training than PAs, and that they are paid less than PAs. Plaintiffs argue that the VA's decision to continue paying PAs on the special pay scale while at the same time refusing to create a special pay scale for NPs has resulted in illegal wage discrimination. Even though PAs perform substantially equal work to NPs, defendants pay them on a special pay scale which plaintiffs allege enables PAs to earn up to $10,000 more per year than similarly situated NPs. Plaintiffs point to VA employee Mary Knowles, who is both an NP and a PA, but who chooses not to invoke her greater educational qualifications as an NP because under the existing pay schemes she earns more money working as a PA.

---

[1]The VA Handbook states that above-minimum entrance rate and special salary ranges apply to nurses and physician assistants. Joint Appendix ("J.A.") at 353 (VA Handbook 5103.9, MP-5, Part II, Chapter 3, 3D-1).

        The VA answered the complaint and filed a motion to dismiss in June 2002.  In September 2002, the district court denied defendant's motion to dismiss, and discovery ensued.  In October 2003, the VA filed a motion for summary judgment, and in November 2003, plaintiffs filed a motion to strike portions of the VA's memorandum in support of its motion for summary judgment as well as an opposition to defendant's summary judgment motion.  On June 9, 2004, the district court issued an order requesting information from the parties about the special pay rate for PAs.  The district court was concerned that the VA's contention that it could place the NPs on a special salary scale only if a recruitment and retention problem existed was a pretext for sex discrimination.  The parties filed supplemental briefs on the issue.  On July 14, 2004 the district court granted the VA's motion for summary judgment, denied the plaintiffs' motion to strike, and entered judgment for the VA.  The district court held that the plaintiffs had established a prima facie violation of the EPA, and proceeded to consider whether the VA had proven any of its asserted affirmative defenses.

        In its motion for summary judgment, the VA contended that the two separate statutory-based pay scales, not sex, was the cause of any pay differences between the NPs and PAs at the VAMC.  The VA argued that these separate pay scales meet three of the four affirmative defenses under the EPA:  a seniority system, a merit system, and "any other factor other than sex."  *See* 29 U.S.C. §206(d)(1).  The district court agreed that the different pay scales constituted a factor other than sex.[2]  Finding that an affirmative defense had been proven such that no genuine issue of material fact remained, the district court granted summary judgment for the VA on both the EPA and Title VII claims.  Seventeen of the plaintiffs then filed a timely appeal.

## II.  ANALYSIS

        We review de novo a district court's grant of summary judgment, and affirm "only if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002).  In order for a factual dispute to be genuine, the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A fact is material if it relates to a disputed matter "that might affect the outcome of the suit." *Id.*  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### A.  Plaintiffs' Equal Pay Act Claims

#### 1.  Plaintiffs' Prima Facie Case Under the EPA

        The EPA prohibits employers from paying an employee at a rate less than that paid to an employee of the opposite sex for performing equal work. *See* 29 U.S.C. § 206(d)(1).  In order to establish a prima facie case of wage discrimination under the EPA, plaintiffs must show that an employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. § 206(d)(1)).  Jobs need not be identical in order to be considered "equal work" under the EPA. *Shultz v. Wheaton Glass Co.*, 421 F.2d 259, 265, & n.10 (3d Cir.), *cert. denied*, 398 U.S. 905 (1970).  Whether a job is substantially equal for purposes of the EPA is determined on a case-by-case basis and "resolved by an overall comparison of the work, not its individual segments."

---

[2]Because the district court concluded that the pay scales met the affirmative defense of "any other factor other than sex," it did not consider whether the pay scales were valid seniority or merit systems.

*Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981) (orderlies and nurses aides perform substantially equal work).

"Unlike the showing required under Title VII's disparate treatment theory, proof of discriminatory intent is not required to establish a prima facie case under the Equal Pay Act." *Peters v. City of Shreveport*, 818 F.2d 1148, 1153 (5th Cir.), *cert. denied*, 485 U.S. 930 (1988), *abrogated on other grounds*, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). "Once the plaintiff establishes a prima facie case, the defendant must 'prove' that the wage differential is justified under one of the four affirmative defenses set forth under § 206(d)(1) of the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Buntin v. Breathitt County Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998) (citing *Corning Glass Works*, 417 U.S. at 196). Because these are affirmative defenses, the defendant bears the burden of proof. *See Corning Glass Works*, 417 U.S. at 197; *see also EEOC v. Romeo Cmty. Schs.*, 976 F.2d 985, 988 (6th Cir. 1992). The burden shifting under the EPA differs from the Title VII framework, in which a "defendant need only assert a legitimate, non-discriminatory reason for the different treatment afforded the plaintiff as compared to her similarly situated male co-workers," *Buntin*, 134 F.3d at 799 n.6, at which point the burden shifts back to the plaintiff to show pretext. Under the EPA, however, the plaintiff "never bears the burden of *persuasion* regarding the affirmative defenses." *Id.* at 800 n.7.

The district court concluded that plaintiffs had established a prima facie case of wage discrimination in violation of the EPA because they presented sufficient evidence such that a reasonable jury could conclude that the positions of NP and PA were fungible at the Cleveland VAMC, and that a PA performing substantially equal duties as an NP would earn more money. The VA argues that the district court erred in this conclusion, and urges us to affirm the district court's grant of summary judgment on the ground that plaintiffs cannot demonstrate a prima facie EPA case. The VA's attack on plaintiff's prima facie case is two-pronged. First, the VA argues that NPs and PAs do not perform substantially equal work, and second, that plaintiffs have not identified appropriate male comparators that earn more. After carefully analyzing the parties' arguments and the record, we affirm the district court's conclusion that plaintiffs have met their prima facie burden.

The district court properly rejected the VA's argument that the jobs of NPs and PAs are not substantially equal because NPs possess *greater* education and skill. While "differences in skill, effort, or responsibility . . . might be sufficient to justify a finding that two jobs are not equal . . . if the greater skill, effort, or responsibility has been required of the higher paid sex, [such differences] do not justify such a finding where the greater skill, effort, or responsibility is required of the lower paid sex." 29 C.F.R. § 1620.14(a). The VA's argument that PAs and NPs do not perform substantially equal work is also belied by the record, which compels the conclusion that the two positions are fungible at the Cleveland VAMC. We agree with the Court of Federal Claims that evidence that the positions being compared are fungible can support a prima facie case under the EPA. *Allison v. U.S.*, 39 Fed. Cl. 471, 475 (Fed. Cl. 1997) (finding that plaintiffs had established a prima facie case because the VA advertised for either NPs or PAs to fill open positions and the Chief NP for one section had authored a memo to the VA's Chief of Staff stating that the two groups had similar responsibilities). Although the VA repeatedly asserts in its brief that the positions at the Cleveland VAMC are not substantially equal, there is undisputed evidence in the record that the defendant considers the positions to be fungible.

In his testimony before the administrative law judge, Dr. Ted Parran, the Medical Director of the Veterans Addiction Recovery Center, explained that he works with and supervises both NPs and PAs. He agreed that the two jobs involve similar skill, effort, and responsibility, and explained that when a position is open it is advertised as a middle level practitioner to be filled either by an NP or a PA. When looking to fill these practitioner positions, Parran stated, "[W]e don't consider

whether it's a Physicians Assistant or a Nurse Practitioner as an issue of qualification." J.A. at 458 (Parran Test. at 103).

In addition to Dr. Parran, several other VAMC employees other than plaintiffs also testified that for hiring purposes, the Cleveland VAMC regards NPs and PAs as fungible. Sondra Marcum, Chief Nurse Executive and Associate Director for Patient and Nursing Services, testified that the basic duties of both jobs at the VAMC can be performed by either NPs or PAs. The Cleveland VAMC, like the Portland Veteran's Facility involved in *Allison*, advertised open positions as seeking either an NP or a PA. *Allison,* 39 Fed. Cl. at 475. Rebecca Everett, Human Resources Specialist at the Cleveland VAMC, testified that most of the vacancy announcements that she has posted have stated that the position could be filled by either a PA or an NP. Everett agreed that NP Beck-Wilson and PA McDonald were doing the identical job. Furthermore, based upon her conversations with VAMC managers, Everett's understanding of the two positions at the VAMC is that "either profession can do what is typically done by most physician's assistants and nurse practitioners." J.A. at 438 (Everett Dep. at 15).

Judy Trepkowski, a VAMC Human Resources Specialist, stated that at no time in her current position could she recall a job listing that was specifically for an NP or a PA, rather than both. Trepkowski testified that at the VAMC, NPs and PAs have similar skills and perform similar functions. Hiring of NPs and PAs is "an interdisciplinary situation where a person from either background would be acceptable to do the work at that time." J.A. at 419 (Trepkowski Dep. at 16). When the VA is interested "in having a person who has a broader educational background and a broader basis," a job posting may specifically request that applicants be NPs. J.A. at 684 (Marcum Dep. at 31).

Despite this overwhelming evidence that the Cleveland VAMC employed NPs and PAs interchangeably, the VA cites *Beall v. Curtis*, 603 F. Supp. 1563 (M.D. Ga. 1985), to support its claim that NPs and PAs do not perform substantially equal work at the VAMC. In *Beall,* an EPA claim brought by NPs was rejected on the ground that the plaintiffs failed to establish that their jobs as NPs were substantially equal to a more recently hired and higher-paid male PA. In that case, however, the PA being paid a higher wage possessed certain skills that the NPs did not, particularly in the area of management of trauma, and his experience with trauma meant that he had different job duties and greater responsibilities than the plaintiffs in that he could take night call in rotation with physicians. *Id*. at 1571-73. The VA, however, has never argued nor has it presented any evidence to suggest that PAs have different duties or more responsibility than do NPs within the Cleveland VAMC, and the VA conceded at oral argument that there is nothing that a PA can do that an NP cannot do. On the contrary, NPs are more highly educated, and discovery produced compelling evidence that NPs and PAs perform similar jobs at the VAMC. The district court's conclusion that plaintiffs established that NPs and PAs at the VAMC perform substantially equal work was proper.

Next, the VA argues that plaintiffs cannot identify appropriate male comparators who are paid more, which the VA claims is fatal to plaintiffs' prima facie case. The VA asserts that complete gender diversity is needed between the comparison classes to satisfy the prima-facie-case requirements and thus, because approximately 5% of NPs are male and 15% of PAs are female, the plaintiffs have failed in their obligation to show an appropriate male comparator. Citing *Corning Glass Works,* 417 U.S. at 208, which stated that a few women among the higher paid groups did not negate an EPA claim, the district court correctly rejected this argument and determined that whether a policy affects both male and female employees to such an extent that an EPA claim would be invalid is a question of fact. We agree that complete diversity between plaintiffs and comparators is not required to state a prima facie case under the EPA. As the Supreme Court stated in *Corning Glass Works*, "To permit [a] company to escape that [equal pay] obligation by agreeing to allow some women to work [in the male dominated position] at a higher rate of pay as vacancies occurred would frustrate, not serve, Congress' ends." *Id*. at 208; *see also Allison*, 39 Fed. Cl. at 473 (holding

that a group of "predominantly female" NPs at the Portland, Oregon VA produced evidence that they performed substantially equal work as the "predominantly male" PAs for less pay in violation of the EPA); *Peters*, 818 F.2d at 1164 (holding that the text of the EPA does not require "near-perfect diversity between the classes"); *Arthur v. College of St. Benedict*, 174 F. Supp. 2d 968, 976 (D. Minn. 2001) (stating that the EPA "does not require perfect diversity between the comparison classes," but when the challenged policy affects both men and women equally, "there can be no EPA violation"). The fact that a small minority of the VAMC PAs are female and a small minority of NPs are male is not fatal to plaintiffs' EPA claim.

The VA also argues that plaintiffs' attempts to identify male comparators who earn more money for doing substantially equal work are insufficient. The district court rejected this claim, citing the undisputed testimony by numerous VA employees that NPs and PAs are interchangeable and the plaintiffs' statistical evidence that PAs are paid more than NPs for performing the same duties. Plaintiffs have presented two types of comparator evidence: (1) an individual comparator for each plaintiff; and (2) statistical evidence of classification-based pay disparities between NPs and PAs and as well as evidence that women receive lower compensation than do men for each year of additional experience under the existing pay scales. We now consider whether this comparator evidence is adequate to meet plaintiffs' prima facie burden.

In determining whether a comparator is appropriate for the purposes of an EPA claim, our focus is on actual job requirements and duties, rather than job classifications or titles. *See Brennan v. Owensboro-Daviess County Hosp.*, 523 F.2d 1013, 1017 & n.7 (6th Cir. 1975). "A plaintiff establishes a prima facie [EPA] case by comparing the jobs held by the female and male employees, and by showing that those jobs are substantially equal, not by comparing the skills and qualifications of the individual employees holding those jobs." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992) (citation omitted). Because the comparison at the prima facie stage is of the jobs and not the employees, "only the skills and qualifications actually needed to perform the jobs are considered." *Id.* Factors like education and experience are considered as a defense to an employer's liability rather than as part of a plaintiff's prima facie case. *Id.* at 1533 n.18 (citation omitted).

Each of the plaintiffs has identified a specific male PA who she alleges is performing substantially equal work but who is receiving higher pay for his work. Appellant Br. at 42-46. Although one plaintiff (who happens to be male) receives only $600 less than his PA counterpart, the disparity is significantly higher for all the other plaintiffs, with several earning over $10,000 less per year than her comparator male PA. The VA asserts that these comparators are inappropriate, and suggests ways in which several of the male comparator employees may differ from plaintiffs. The VA claims that in selecting their comparators, plaintiffs have not adequately accounted for employees' duties, care-lines, departments, or years of experience in current position. The VA improperly focuses upon alleged differences between employees, rather than the jobs they perform, and also overstates the plaintiffs' burden of showing a higher-paid comparator at the prima facie stage. "The text of the EPA may not be brushed with such a demanding gloss" as to suggest that plaintiffs' prima facie case fails because each one has not identified "one specific individual who constitutes a *perfect* male comparator." *Wheatley v. Wicomico County*, 390 F.3d 328, 334 (4th Cir. 2004) (emphasis added). Moreover, whether two positions are substantially equal for EPA purposes is a question of fact for the jury. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1311 (2d Cir. 1995) ("[I]t is for the trier of fact to decide if [there] is a significant enough difference in responsibility to make the jobs unequal."), *abrogated on other grounds*, *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998). When we compare the jobs performed by NPs and PAs, we conclude that the district court was correct in holding that plaintiffs have identified more highly paid male comparators. The record does not suggest that the comparator PAs hold jobs that require different skills or qualifications, but on the contrary, the VA's own employees agree that the duties of the two positions are interchangeable.

In addition to identifying male comparators, plaintiffs have also produced statistical evidence that the predominantly male PAs are paid more than the predominantly female plaintiffs for performing substantially equal work. Dr. Rosen, the plaintiffs' statistical expert, concluded that VAMC PAs are paid an amount that is statistically significantly higher than what is paid to NPs, and that this pay disparity cannot be explained by working experience either within the VA or outside or by differences in educational attainment. Despite the fact that the VAMC NPs are better educated than their PA counterparts, the PAs earn on average $4,655 per year more than NPs at the VAMC. According to Rosen, this pay disparity is in contrast to a survey of salaries paid in the Cleveland area, which indicates that NPs are typically paid more than PAs. The pay disparity between NPs and PAs is even greater at the upper ends of the pay scale, with the top rates for PAs in 2002 being some $9,336 more than the top rates for NPs. Thus, under the existing pay scheme, with PAs receiving pay under a special GS pay scale and NPs receiving pay under the standard Nursing Pay Scale, female employees are not being compensated in the same way as their male counterparts for each additional year of experience.[3] Rosen concluded that the VA's current pay scheme is economically discriminatory against the predominantly female NPs.

The VA argues that it was improper for the district court judge to consider this class-wide statistical analysis as evidence of a prima facie EPA violation. We disagree, and we affirm the district court's conclusion that this statistical evidence of a gender-based disparity in pay supports plaintiffs' prima facie case. We have previously held that an EPA plaintiff can rely upon statistical evidence of a gender-based disparity in pay when establishing a prima facie EPA case. *See Kovacevich v. Kent State Univ.*, 224 F.3d 806, 828 (6th Cir. 2000) (considering plaintiff's statistical research showing gender-based disparities in merit awards and top salary-earners as part of the "combination of evidence" that created a genuine issue of material fact on plaintiff's EPA claim). Applying *Kovacevich* to this case, we hold that plaintiffs properly presented statistical evidence of a gender-based pay disparity in conjunction with individual comparator evidence in order to meet their prima facie burden. *See also Lavin-McEleney v. Marist College*, 239 F.3d 476, 481 (2d Cir. 2001) (holding that plaintiff, who identified a specific male comparator, can also compare herself to a statistical composite of comparable male employees in order to establish EPA liability as well as to calculate damages).

The VA has not presented any evidence to show that the jobs performed by the comparator PAs differ in content to those performed by plaintiffs. Instead, the record before us indicates that an overall comparison of the work of NPs and PAs, as attested to by the VA's own human resources and supervisory personnel, is substantially equal. We must "believe the evidence presented by the nonmovant[s], and draw all justifiable interferences in [their] favor." *Cotter*, 287 F.3d at 597 (citing *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 933-34 (6th Cir. 2000)).

As the movant for summary judgment, the VA has failed to show that a reasonable juror could not find that plaintiffs established their prima facie case. *Buntin*, 134 F.3d at 798. The district court's conclusion that a reasonable jury could determine that the positions of NP and PA at the Cleveland VAMC were fungible and that a PA performing substantially the same duties as an NP

---

[3] Rosen's regression analysis of gender and experience as factors in NP and PA pay also indicates a gender-salient difference in how experience is compensated at the VAMC. Rosen compared a "total experience" analysis of how each additional year of experience as an NP or a PA is compensated with a "gender experience" analysis of what increased compensation each year of additional experience produced for women NPs and PAs. The total experience regression (average of men and women NPs and PAs) suggested that each year of additional experience would result in $562.47 of additional compensation. J.A. at 415-16 (Rosen Dep. at 129-135). In comparison, however, Rosen's gender experience regression (comparing men and women regardless of whether they are an NP or a PA) indicated that under the existing pay scheme, each additional year of experience for a woman results in smaller pay increases than for their male counterparts. Rosen concluded that "on average, if you're a woman each year of experience has been compensated by $179 less." J.A. at 416 (Rosen Dep. at 134).

would earn more money is sound. We affirm the district court's holding that plaintiffs have established a prima facie EPA violation.

### 2. Defendant's Affirmative Defense of A "Factor Other Than Sex"

Once a plaintiff establishes a prima facie EPA violation, a defendant bears both the burden of persuasion and production on its affirmative defenses. *See Buntin*, 134 F.3d at 800 n.7 (stating that an EPA defendant always bears the burden of persuasion regarding the affirmative defenses, and that a "plaintiff bears the burden of *producing* evidence of pretext solely where a reasonable jury viewing the defendant's evidence could find only for the defendant" on the issue of the affirmative defense); *see also EEOC v. Delaware Dep't of Health and Soc. Servs.*, 865 F.2d 1408, 1415 (3d Cir. 1989) (stating that a defendant has "the burden of persuasion, not merely the burden of production, on [its] affirmative defense"). "The Equal Pay Act was intended as a 'broad charter of women's rights in the economic field [and] sought to overcome the age-old belief in women's inferiority and to eliminate the depressing effects on living standards of reduced wages for female workers and the economic and social consequences which flow from it.'" *Bence v. Detroit Health Corp.*, 712 F.2d 1024, 1029 (6th Cir. 1983) (quoting *Shultz v. American Can Co.–Dixie Prods.*, 424 F.2d 356, 360 (8th Cir. 1970)). "The Equal Pay Act is broadly remedial, and it should be construed and applied so as to fulfill the underlying purposes which Congress sought to achieve." *Corning Glass Works*, 417 U.S. at 208.

We have therefore held that the Equal Pay Act's exception that a factor other than sex can be an affirmative defense "does not include literally *any* other factor, but a factor that, at a minimum, was adopted for a legitimate business reason." *EEOC v. J.C. Penney* Co., 843 F.2d 249, 253 (6th Cir. 1988) (quotation omitted). "[T]he burden of proving that a factor other than sex is the basis for a wage differential is a heavy one." *Brennan*, 523 F.2d at 1031. "[U]nless the factor of sex provides *no* part of the basis for the wage differential, the requirements [for the defense] are not met." *Id.* (emphasis added) (quotation omitted). In order "to survive [a] defendant's motion for [summary judgment], the EPA plaintiff need not set forth evidence from which a jury could infer that the employer's proffered reason for the wage differential is pretextual." *Buntin,* 134 F.3d at 799. Rather, as the party who bears the burden of persuasion, the defendant who makes a motion [under Rule 56(c)] must demonstrate that there is no genuine issue as to whether the difference in pay is due to a factor other than sex. *Id*. at 799-800 (citing *EEOC v. Romeo*, 976 F.2d at 989). Thus the district court's grant of the VA's motion for summary judgment can be upheld "only if the record shows that [the VA] established the defense so clearly that no rational jury could have found to the contrary." *Id*. at 800 (quotation omitted).

The district court held that the distinct salary programs that govern the pay of NPs and PAs was a factor other than sex, and that the VA had met its burden of proof on this defense with such compelling evidence that no genuine issues of material fact remained. We do not agree that the VA has established this defense so clearly. Because we conclude that the VA has failed to demonstrate that there is no genuine issue of material fact about whether a factor other than sex produced the pay differential between PAs and NPs, we reverse the district court's grant of summary judgment to the VA.

The VA urges us to apply precedent from other courts that have held that a distinct salary program can serve as a "factor other than sex" defense to an EPA claim where the individual receiving the higher salary under the salary program has appropriate background and experience to explain the pay differential. In these cases, the "factor other than sex" defense established has been a sort of hybrid between the seniority and merit defenses. In these instances, the more highly-paid male employee was found to have greater experience or qualifications for the job, or to hold greater job responsibilities. The VA has not demonstrated that such differences between PAs and NPs exist at the Cleveland VAMC.

In *EEOC v. Aetna Ins. Co.*, 616 F.2d 719 (4th Cir. 1980), the Fourth Circuit held that Aetna's decision to pay a newly hired male insurance underwriter more than existing female underwriters "was attributable to the existence of two distinct salary programs" and "was explained by [his] experience and background, two considerations which were not sex-linked." *Id.* at 726. Similarly, in *Girdis v. EEOC*, 688 F. Supp. 40 (D. Mass. 1987), the district court found no EPA violation where a male EEOC employee received higher pay than female employees due to the "good faith operation of *bona fide*, gender-neutral, acceptable government employment programs" and the court determined that the higher-paid male "*was qualified for his higher salary by his experience and background*." *Id.* at 46-47 (emphasis added). In this case, however, the VA cannot claim, based on the record before us, that the experience and background of PAs qualify them to receive higher pay than NPs with equivalent years of medical experience. The VA's reliance upon *Aldrich v. Randolph Central School District*, 963 F.2d 520 (2d Cir. 1981), is also misplaced. In *Aldrich*, the Second Circuit held that "a job classification system [could] serve as a factor-other-than-sex defense to sex-based wage discrimination claims only when the employer proves that the job classification system resulting in differential pay is rooted in legitimate business-related differences in work responsibilities and qualifications for the particular positions at issue." *Id.* at 525. The testimony of numerous VA employees other than plaintiffs, however, suggests that no business-related differences in work responsibilities exist, and that the two positions are fungible.

While we decline to entertain the VA's arguments about alleged differences in experience between higher-paid PA employees and plaintiffs at the prima facie stage, we now consider those arguments at the affirmative defense stage. The VA suggests that some PAs may receive higher pay than NPs with similar years of overall medical experience because the PAs have more years of service in the specific position of PA than do the lesser-paid plaintiff NPs as NPs, given that many of the NPs practiced as RNs before obtaining their master's degree and NP certification. The VA's contention that position-specific experience (rather than all relevant nursing or medical experience) justifies paying PAs more despite the undisputed testimony that their work is fungible with the work of NPs and that PAs do not fulfill any job responsibilities that NPs cannot perform raises a genuine issue of material fact that a jury should decide. In order to prevail on summary judgment on this issue, the VA would have to establish that no reasonable jury could find that an NP's prior nursing experience rendered her equally qualified as a PA who had served in that role for the same length of time. The VA cannot meet this heavy burden at this stage of the case. On the contrary, the greater educational requirements for NPs suggests that such an NP would have experience and background at least equivalent to, if not superior than, a PA with similar years of PA experience.

The VA's argument that the two Congressionally-mandated pay scales for NPs and PAs is a "factor other than sex" that is responsible for any existing pay differential is at its core an argument that within these pay scales the VA lacks the authority to correct any pay differential between the two professions. The plaintiffs argue that the VA's failure to issue a special salary rate for NPs at the Cleveland VAMC while at the same time insisting that the special rate for the PAs must continue results in sexually discriminatory pay differences in violation of the EPA. The VA's response is, in essence, that its hands are tied by the statutory-based pay framework and thus that the VA must continue the status quo pay scheme for the two positions, despite any sexually discriminatory pay differential. First, the VA argues that it must continue to pay PAs under the increased special pay scale. Second, the VA claims that it lacks the authority to place the NPs under a similar increased special pay scale because there is no recruitment or retention problem for NPs. We find both arguments to be unsupported by the record. The VA's argument confuses its obligation to pay NPs and PAs within the Congressionally-mandated frameworks with an obligation to maintain the status-quo application of those pay frameworks.

On the first point, the VA contends that it must maintain the special pay rate for the PAs to ensure competitive pay and adequate staffing of PAs despite no longer having a recruitment or retention problem. Cleveland VAMC Director Montague declared that, "If I would not certify this

fact [that it was necessary to pay the PAs on the special pay scale], the PAs would receive pay cuts which would result in retention issues for current employees." J.A. at 590 (Montague Decl., June 16, 2004); Appellee Br. at 16 ("Absent this annual certification, currently employed VAMC PAs would receive pay cuts."). The district court accepted this argument, and stated that the plaintiffs had not presented any evidence to rebut this showing. The record, however, does contain evidence to rebut this claim, and therefore the district court erred in accepting the defendant's assertion that it could not eliminate the special pay scale for PAs without causing a reduction in PA pay to current employees. The VA Handbook, submitted by the VA as Exhibit N attached to its motion for summary judgment, expressly speaks to Director Montague's concern that existing PAs would receive a reduction in salary upon the termination of a special pay scale, and appears to mandate that such a reduction *must not* occur. The VA Handbook states that "[a]n employee's rate of basic pay shall not be reduced as a result of a reduced or discontinued . . . special salary rate range." J.A. at 358 (VA Handbook 5103.9, MP-5, Part II, Chapter 3, 3D-6) (stating that if such special rates are reduced or terminated, the employee "shall be placed in the lowest step rate of the applicable rate range which does not result in a reduction of the employee's basic rate of pay"). A reasonable jury could conclude the VA's argument that it must continue to pay the predominantly-male PAs on a special pay scale is pretextual.

On the second point, the VA claims that it lacks the authority to place NPs on a special pay scale. The district court also relied upon this claim in granting summary judgment to the VA. The district court found that a factor other than sex was responsible for the pay differential "with the caveat that the VA be able to establish that it *does not* have the authority to place NPs on a special salary schedule, as [p]laintiffs claim they should be." J.A. 637 (Order at 18) (emphasis added). We do not agree that the VA's claim that its "inability to implement a separate pay scale for NPs" is a valid "factor other than sex" defense. Appellee Br. at 33. The record suggests that the VA does have the authority to place the NPs on an increased special pay scale, and that such authority could be appropriately exercised because evidence does suggest a recruitment and retention problem exists for NPs.

The plain language of two different statutory provisions authorizes the defendant to create a special pay scale for NPs. *See Allison*, 39 Fed. Cl. at 476. Section 7451(c)(1) of the Nurse Pay Act enables the VA to raise the maximum pay at a particular grade to 175 percent of the minimum in order to recruit and retain a sufficient number of high-quality health-care personnel. Additionally, the VA agrees that it has the authority to create a special, increased pay scale for NPs under 38 U.S.C. § 7455.[4] Director Montague admits that he can authorize a special NP pay scale but that he has not done so because he does not believe the VAMC has a recruitment or retention problem with NPs. The VA argues that its authority to increase NP pay "is expressly limited to instances where there is a documented recruitment and retention problem in a particular job classification in a particular local market." Appellee Br. at 29. The VA then argues that there are no problems with recruiting or retention of NPs at the Cleveland VAMC, and therefore it cannot raise the pay for NPs.

The only evidence that the VA offers to support its contention that the Cleveland VAMC does not have a recruiting or retention problem is the statement of Director Montague. Montague stated that during his tenure, the Cleveland VAMC has not had difficulties recruiting and retaining NPs and PAs "and has, in fact, paid for many of its RNs to obtain advanced practice degrees or their NP education and certification." J.A. at 591 (Montague Decl., June 16, 2004); J.A. at 362 (Montague Decl., Oct. 7, 2003). Both the VA and the district court viewed the practice of paying for existing RNs to become NPs as evidence that the Cleveland VAMC *does not* have any recruiting

---

[4] § 7455 states that increases in basic pay may be made "(1) to provide pay in an amount competitive with, but not exceeding, the amount . . . paid to the same category of personnel at non-Federal facilities in the same labor market; (2) to achieve adequate staffing at particular facilities; or (3) to recruit personnel with specialized skills, especially those with skills which are especially difficult or demanding." 38 U.S.C. § 7455(b)(1)-(3).

or retention problems for NPs. However, we believe that a reasonable jury could interpret this practice as evidence that the VA *does* have a problem recruiting NPs, such that it must absorb the cost of its employees obtaining their advanced degrees and NP certifications in order to meet its NP staffing needs. That the VA has had the practice of paying for RNs to become NPs despite the fact that the VAMC "has had a severe shortage of . . . registered nurses" in the past suggests a significant need for NPs that is not being filled by qualified candidates in the job market. J.A. at 362 (Montague Decl., Oct. 7, 2003). If there were available NPs in the job market, it would make more sense for the VA to hire them instead of paying the additional costs for its RNs to become NPs, thereby creating a need to replace those promoted to NP with more hard-to-find RNs. A reasonable jury could conclude that the VA has an NP recruitment problem.

Although they do not bear the burden of persuasion (or even production) on this recruitment and retention issue, the plaintiffs have offered evidence to rebut the VA's claim that no recruitment or retention problem exists. Dr. Parran stated that he knows of at least three NPs who left the VA since 1995 for jobs in private practice. In her 2000 testimony before the ALJ, Chief Nurse Marcum testified that in the two previous years, four NPs had resigned. In the eight years prior to her ALJ testimony (1992-2000), fifteen NPs had resigned, which was a rate of about two per year.[5] J.A. at 473 (Marcum Test. at 302). The VA stipulated during oral argument that there are approximately thirty PAs and thirty-two NPs currently employed by the VAMC. A reasonable jury could conclude that the VA has an NP retention problem.

Additionally, plaintiff Judith Karg also testified that she quit her job with the Cleveland VAMC and accepted an NP job at the Tucson, Arizona, VA facility because she will earn more money as an NP there. The Tucson VA facility does have a separate pay scale for NPs. Finally, plaintiff Laura Beck-Wilson testified that former VAMC NP Jeannette DiChiro took a position at another VA facility in Las Vegas because they had a separate pay scale for nurses, and DiChiro was therefore able to receive a significant increase in pay. Beck-Wilson also testified that she resigned from her position as clinic coordinator, an additional administrative role that she had previously assumed, because she was being paid less than a PA for performing the same duties.

The evidence of numerous NP resignations and the practice of paying for RNs to become NPs to satisfy its need for NPs raise a genuine issue as to whether the VA has a recruitment and retention problem for NPs. A reasonable jury could find that the VA has the ability to exercise its authority under the relevant statutes to increase the pay for NPs. Given that the VA has refused to issue a special salary pay scale for the NPs at the VAMC at the same time that it has insisted upon extending the special salary pay scale for the PAs, a reasonable jury could conclude that the VA's contention that the pay scales are responsible for the existing pay differential between NPs and PAs at the Cleveland VAMC is a pretext for sex discrimination. The VA did not meet its high burden of proof on this issue, and therefore we reverse the district court's grant of summary judgment to the VA on the plaintiffs' EPA claim.

## B.  Beck-Wilson's VII Wage Discrimination Claim

Laura Beck-Wilson, the only plaintiff to have exhausted her Title VII administrative remedies to allow her to advance a Title VII claim, also appeals the district court's grant of summary judgment to the VA on that claim. A Title VII claim of wage discrimination parallels that of an EPA violation insofar as it incorporates the EPA's affirmative defenses. *Washington County v. Gunther*, 452 U.S. 161, 167-71 (1981). An employer may therefore avoid liability under a Title VII wage discrimination claim if it can establish one or more of the four affirmative defenses in the EPA. *See*

---

[5]Marcum stated that she had not reviewed the reasons for those NP resignations. J.A. at 473 (Marcum Test. at 302).

*Odomes*, 653 F.2d at 251 ("The four exemptions enunciated by the Equal Pay Act are applicable to Title VII claims of unequal pay for equal work.") (quotation omitted). The district court held that the VA was entitled to summary judgment on Beck-Wilson's EPA claim because the VA had established an affirmative defense, and so it also granted summary judgment to defendant on her Title VII claim. "[W]here the plaintiff defeats the defendant's motion for [summary judgment] with respect to her EPA claim by raising a genuine issue as to the defendant's reason for the differential wage, she also defeats [its] motion for [summary judgment] brought against her parallel Title VII claim." *Buntin*, 134 F.3d at 801. Because we hold that plaintiffs defeated the VA's motion for summary judgment on the EPA claim, the district court's decision to grant summary judgment to the VA on Beck-Wilson's Title VII claim must also be reversed.

## III.  CONCLUSION

Accordingly, we **REVERSE** the district court's grant of summary judgment to the defendant with respect to plaintiffs' EPA and Title VII wage discrimination claims, and **REMAND** this case to the district court for further proceedings in conformity with this opinion.